**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | CASE NO. 1:20 CR 470 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Rico Polk, | ) | <u>Order</u> |
| | ) | |
| Defendant. | ) | |

### INTRODUCTION

This matter is before the Court upon defendant Rico Polk's Motion to Suppress (Doc. 35).  For the reasons that follow, the motion is DENIED.

### FACTS

The Court held a suppression hearing at which the government offered the testimony of five witnesses: DEA Special Agent Fregosi ("SA Fregosi"), DEA Task Force Officer Orlando Almonte ("TFO Almonte"), DEA Special Agent Shaun Moses ("SA Moses"), DEA Task Force Officer Luke Combs ("TFO Combs"), and DEA Special Agent Andrew Nowling ("SA Nowling").  The facts set forth herein are taken from the testimony of these witnesses, as well as

1

the DEA Reports of Investigation (Def. Exs. A, B). The Court has further reviewed all of the remaining exhibits submitted by both the government and defendant.

In the fall of 2019, the DEA set up a "reverse sting" operation, which is an operation in which the DEA acts as the seller of drugs in order to attract would-be purchasers. The operation involved the sale of approximately 50 kilograms of cocaine valued at approximately $1.5 million. Although unclear, it appears that a confidential informant learned that an individual, later identified as co-defendant Wusbaldo Maldonado, would be "mediating" the deal. TFO Almonte, acting undercover, spoke with Maldonado, and the two discussed the fact that "La Officiano" had "greenlighted" the deal. They further discussed the details regarding a proposed meet. DEA researched Moldonado and learned that he had a previous federal drug trafficking offense. In addition, DEA intelligence further indicated that Maldonado was a narcotics trafficker for the Pato Drug Trafficking Organization. Based on TFO Almonte's conversations with Moldonado, the government obtained a ping warrant to track Modonado's cell phone, as well as a pen register to track his incoming and outgoing calls.

Subsequent conversations between TFO Almonte and Maldonado occurred. TFO Almonte told Moldonado that he would be traveling to Cleveland. Maldonado indicated that he would also travel from Chicago to Cleveland in order for the two to meet. The DEA tracked Maldonado's location from Chicago through the Cleveland airport. The two met at a Bob Evan's restaurant regarding the prospective drug deal. Maldonado and TFO Almonte left Bob Evans, and TFO Almonte drove Maldonado to a Car Parts Warehouse store. With the exception of a short period of time after Moldonado left the airport, Moldonado was under constant surveillance by various law enforcement officers.

2

After dropping off Moldonado at the Car Parts Warehouse store, TFO Almonte returned to the DEA office.  Agents continued to watch Moldonado.  Shortly after TFO Almonte dropped off Moldonado, a gray Dodge Durango arrived at the Car Parts Warehouse.  Maldonado entered the passenger side of the vehicle.  The driver was later identified as co-defendant Lewis.

Subsequently, the Dodge Durango departed the Car Parts Warehouse and made a few stops.  It appears that during this time, Maldonado and TFO Almonte had several phone conversations about where the drug deal would take place.  Maldonado informed TFO Almonte that he was not in possession of the money.  Lewis then spoke to TFO Almonte and informed him that the money was "nearby."  TFO Almonte repeatedly questioned Moldonado about the location of the money.

At approximately 4:55 that afternoon, the Durgano carrying Maldonano and Lewis arrived at an address on Miles Road.  There is a closed metal cross-bar type gate in front of the driveway.  The driveway is long and at the end there is an old warehouse or garage. A red Jeep with its lights on was backed into an open garage at that address.  A few minutes later, a black Chevy Traverse arrived on the scene.  The Jeep pulled up to the road, closed the gate behind the Traverse, and returned back to the property.  The Traverse reversed into the garage and the garage door shut.   The DEA divided the surveillance team into three units.  Each was assigned to follow one of the vehicles in the event of a departure.

Shortly thereafter, TFO Almonte called Maldonado.  Maldonado informed TFO Almonte that Moldonado was now in possession of all of the money.  Moldanado sent a Facetime video to TFO Almonte showing several bags containing bundles of wrapped currency.  Within 20 minutes of the arrival of the Durango, all three vehicles departed.  According to the testimony of

3

TFO Combs, all three vehicles left the scene in immediate succession.  The Jeep, which was driven by defendant, pulled out of the driveway first, followed by the Chevy Traverse.  TFO Combs further testified that at that point, a decision was made to stop all three vehicles.  After the Jeep and Traverse departed, agents stopped the Durgano at the end of the driveway on Miles Road.  According to Combs, Moldoano and Lewis were ordered out of the vehicle for an "investigatory" stop.  Agents questioned Lewis and Moldonado, and Lewis consented to a search of the vehicle.  Although discovering a small amount of suspected marijuana, agents released the two shortly thereafter.

Meanwhile, another surveillance team attempted to follow the Traverse, but were unsuccessful.  While following the Traverse, agents learned that it was registered to Rico Polk.  Around the same time, agents learned that the Jeep was a rental car rented in the name of Rico Polk.  SA Nowling testified that agents were informed to "stop" the vehicle when it was safe to do so.  Agents engaged in a "containment" procedure, whereby one police vehicle pulled in front of the Traverse and one approached from behind.  Despite their efforts, the Traverse was able to maneuver out from the front and began driving away recklessly.  At some point, the surveillance was canceled.

At or near the same time, another team of agents followed the Jeep.  SA Moses, who testified at the suppression hearing, was one of the agents assigned to the Jeep.  He observed the Jeep leave the driveway and make two U-turns in quick succession.  Based on his training and experience, he believed that the Jeep was engaging in "counter-surveillance" maneuvers in order to avoid detection by law enforcement.  Eventually, the Jeep pulled into an address not far down the street from the location where the Jeep originated.  This happened to be the location from

4

which SA Moses was conducting his surveillance.  Upon entering the driveway, the Jeep nearly

collided with SA Moses's vehicle.  The Jeep then proceeded to go to the rear of a building on the

property.

SA Moses describes the location as an abandoned commercial space.  According to SA

Moses, there was a sign out front, but it did not appear that any business occurred at the location.

It appeared to SA Moses that the Jeep had no reason to be behind the abandoned building.   SA

Moses's understanding was that he was to stop the vehicle and "figure out what was going on."

He waited a brief moment until at least one other member of law enforcement was with him

before proceeding to the rear of the building.  At this point, SA Moses had his badge around his

neck, but was not able to put on his vest.

Upon arriving at the rear of the building, SA Moses discovered the Jeep located near a

dumpster.  The front end of the vehicle was facing outward, as if the vehicle had backed in

toward the rear of the building.  The driver's side door of the Jeep was open.  SA Moses

observed an individual, later determined to be defendant Polk, standing to the rear driver's side

of the vehicle.  SA Moses pulled his vehicle up to the front of the Jeep in order to partially block

it.  As SA Moses exited his vehicle, Task Force Agent Lajack ("TFA Lajack") pulled past SA

Moses's vehicle.  According to his testimony, SA Moses intended to conduct an investigatory

stop in order to "identify who was in that vehicle and what they were doing."  The report

prepared by SA Moses, however, indicates that prior to the encounter behind the building, SA

Moses was instructed to "take the driver of the red Jeep into custody."

As SA Moses exited his vehicle, he announced his presence as a police officer, drew his

weapon, and instructed Polk to put his hands in the air.  At the same time, TFA Lajack ordered

5

Polk to "get on the ground."  SA Moses placed Polk's hands behind his back and Polk immediately informed SA Moses that he had a pistol in his pocket.   SA Moses cannot recall whether he asked Polk if he had a weapon or if Polk volunteered the information.  SA Moses indicated that it is a standard question asked whenever someone is "taken into custody." Ultimately, Polk was placed in handcuffs.  There is a disparity between SA Moses's testimony and his report as to the timing of the placement of the handcuffs.  According to the report, Polk alerted him to the pistol while SA Moses had Polk's hands behind his back, but before TFA Lajack placed him in handcuffs.  SA Moses testified, however, that "Polk got right on the ground.  We got him in handcuffs, and he alerted us to the pistol."  SA Moses asked Polk whether he had a permit.  Polk responded that the did not have a permit and that the gun belonged to his son.  Approximately 10-15 seconds elapsed form the time SA Moses exited the vehicle and the time Polk alerted him to the presence of the pistol.  Thereafter, SA Moses recovered the firearm from Polk's front pocket.

Polk became verbally argumentative and informed officers that he was not going to cooperate.  He declined to tell officers his name.

While on the scene, SA Moses detected an "overpowering" smell of marijuana coming from the open front door of the Jeep.  Based on his years of experience, SA Moses is familiar with the smell of marijuana.  In his report, SA Moses indicates that the officers engaged in a "probable cause" search of the Jeep.  In doing so, officers found 528 grams of suspected marijuana, 414 grams of cocaine, a box of sandwich bags, and $2,000.00 in $20.00 bills.  During the search, an officer on the scene learned that Polk has a felony conviction.  Ultimately, Polk was taken to the county jail, where he was later released.

6

This case followed.  The indictment charges Polk with various drug and gun counts related to his conduct as set forth above.  Polk moves to suppress all evidence.  According to Polk, the officers lacked probable cause to arrest him and all of the evidence obtained by the government is "fruit of the poisonous tree" and must be excluded.  The government opposes the motion.  The government argues that the encounter was a *Terry* stop, supported by reasonable suspicion.  Defendant informed officers that he had a weapon on him for which he did not have a permit.  The government argues that this provides a basis to search for the gun and, further provides probable cause for an arrest.   The government also argues that the evidence located in the car is not subject to suppression because the officers had an independent basis for the vehicle search.  The detection of the odor of marijuana emanating from the Jeep gave probable cause to support the search.

**ANALYSIS**

1.       Gun

Defendant argues that the gun officers discovered on him must be suppressed because it was discovered as the result of an illegal arrest.  According to defendant, officers arrested him when they ordered him to the ground at gunpoint, placed his hands behind his back, and ultimately placed him in handcuffs. Defendant points out that officers had been instructed to take defendant "into custody."   Defendant claims that the government lacked probable cause for an arrest.  The government argues that the initial encounter was an investigatory *Terry* stop for which only "reasonable suspicion" is required.   According to the government, the fact that SA Moses drew his weapon, ordered defendant to the ground, and placed defendant's hands behind his head does not transform an investigatory stop into an arrest.  Here, officers took reasonable

7

steps in ensure officer safety.  In doing so, officers discovered a weapon for which defendant did

not possess a permit.

> The Fourth Amendment provides that, 'the right of the people to be secure in their persons, ... against unreasonable searches and seizures, shall not be violated.'  A seizure occurs when under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.  The Supreme Court has distinguished two forms of seizure, each of which garners a different level of scrutiny.  An officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, he has reasonable suspicion, that is, a particularized and objective basis for suspecting the particular person ... of criminal activity based on specific and articulable facts. For such a stop to be reasonable, the degree of intrusion into the suspect's personal security [must be] reasonably related in scope to the situation at hand. If the length and manner of the stop, including any force used, are not reasonably related to the basis for the initial intrusion, then the stop ripens into an arrest, for which the officers must show probable cause.

*Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015).

A detention will become an arrest when the "seizure exceeds the bounds of a permissible

investigative stop...."  *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir.2008).   Police actions are

limited to "checking out the suspicious circumstances that led to the original stop."  *United

States v. Obasa*, 15 F.3d 603, 607 (6th Cir.1994).   Factors used to determine whether an "an

investigative stop is reasonably related to the basis for the original intrusion" include "the length

of the detention, the manner in which it is conducted, and the degree of force used."  *Smoak v.

Hall*, 460 F.3d 768, 781  "[T]he investigative methods employed should be the least intrusive

means reasonably available to verify or dispel the officer's suspicion in a short period of time. "

*Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir.2005) (citation and quotations omitted).

> The reasonableness of a stop is thus determined by two factors: (1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding

8

circumstances. In other words, the greater the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing.

*Smoak*, 460 F.3d at 779 (citation and quotations omitted).

"An investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Al-Menali v. Marriott International, Inc.*, 2018 WL 7435976 (N.D. Ohio Sept. 25, 2018). Courts apply a totality of the circumstances test and consider "factors such as the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *Hoover v. Walsh*, 682 F.3d 481, 498 (6th Cir. 2012)(citation and quotations omitted). While the use of weapons and handcuffs are not "typical of *Terry* stops...'officers may draw their weapons or use handcuffs so long as circumstances warrant that precaution.'" *Al-Menali*, 2018 WL 7435976 at * 9 (*quoting Bennett v. City of Eastpointe*, 410 F.3d 836, 836 (6th Cir. 2005)). "To justify a pat-down search during a *Terry* stop the Fourth Amendment requires a reasonable belief that the suspect is armed and dangerous; likewise, for the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Bennett*, 410 F.3 at 836.

Upon review, the Court finds that the defendant's motion is not well-taken. The agents engaged in a permissible *Terry*-stop, during which they properly conducted a patdown and discovered the gun in question. As an initial matter, the Court finds that the government easily establishes that reasonable suspicion exists to support the stop. DEA agents conducted a large scale investigation involving a drug dealer with suspected ties to a Mexican drug cartel. The

agents themselves set up a $1.5 million cocaine buy.  Agents knew that Moldonado and one other individual were present at the Miles Road location.  Based on the recorded conversations generally referring to other people, agents reasonably believed the other individuals may be involved in the consummation of the drug deal.  Prior to the arrival of the Duragno at Miles Road, agents observed the Jeep at the location.  The Jeep was backed into an open garage with its lights on.  Upon the arrival of the Traverse, the Jeep drove up to the gate and allowed the Traverse to enter.  At approximately 5:14, TFO Almonte called Moldonado and Moldonado confirmed that he could see the money.  TFO Almonte then received pictures of several suitcases of money.  Almost immediately thereafter, the three vehicles  including the Durango containing Moldonado   attempted to exit in quick succession.  Upon departing, the Jeep immediately engaged in counter-surveillance techniques, eventually pulling into a nearby location that appeared abandoned. The Jeep then traveled to a location behind a building.  Having placed the Jeep at the precise location where Moldonado and a large sum of money were located, together with the fact that the Jeep and Moldonado's vehicles left the location at the same time, gave the agents reasonable suspicion to believe that the driver of the Jeep may have involvement in the drug deal.  *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010)("An officer may conduct an investigatory stop only if he has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.").    Thus, the first factor, *i.e.*, whether reasonable suspicion supports the stop, is satisfied. [1]

     Defendant's argument, however, is directed at the second factor.  Under the second

---

[1]     The Court notes that defendant does not dispute that the encounter
     satisfies the "reasonable suspicion" standard.

10

factor, the Court must determine "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand."  The Sixth Circuit has held that the level of danger present in a situation is relevant to this factor.  In *Houston v. Clark Cty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999), the Sixth Circuit held that the use of guns and handcuffs was justified where a fight broke out at a local establishment.  An officer heard a "pop" and believed that an individual  possibly his partner  had been shot.  The officer then saw a vehicle leave the scene, but was unable to provide any information regarding the make or model.  Nor was the officer able to provide a description of the driver.  The officer radioed for assistance and informed dispatch as to the location of the vehicle.  It appears there was some confusion, and another officer pulled over a different vehicle.  The officer drew his weapon and pointed it at the driver.  The driver was ordered to throw his keys out of the car.  It does not appear that the driver complied.  In the meantime, other officers arrived at the scene and drew their weapons.  The driver and passenger were ordered out of the vehicle, placed on the ground, at which point they were handcuffed and moved to the rear of the police cruiser.  After clarifying that no one was shot, and without other evidence to support an arrest, the two were released.  The detention lasted a total of 30-60 minutes.

The Sixth Circuit determined that the actions of the officers were reasonable under the circumstances and that the investigative stop did not become an arrest.  Specifically, the court held:

> ...[W]e see no Fourth Amendment violation in the conduct of Deputy Hopper and Troopers Click and Dickens. Specifically, when police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are "reasonably necessary for the protection of the officers."  Further, detention in a police cruiser does not automatically transform a *Terry* stop into an arrest.  Nor does the use of handcuffs exceed the bounds of a *Terry* stop, so

11

long as the circumstances warrant that precaution. We have so held in two unpublished opinions.... Moreover, based upon the facts known to the officers at the time of the stop, their use of handcuffs and their detention of the men in the cruisers were both reasonably necessary to protect the officers' safety during the investigation. These precautions were therefore "reasonably related" to the investigation that warranted the initial stop.

*Id.* at 814-15.

The court noted that, although the length of the detention was somewhat troubling, based on a totality of the circumstances, no arrest occurred.

Although here the crime at issue did not directly involve violence, crimes indirectly involving violence may "support an inference of dangerousness that justifies intrusive measures during [an] investigatory stop." *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015).

In *United States v. Heath*, 259 F. 3d 522 (6th Cir 2001), the Sixth Circuit addressed a case with similar facts. There, officers surveilled defendant, who was seen at a suspected drug house. Defendant had a prior felony drug conviction. At one point, officers observed defendant in the company of a known "large-scale drug trafficker." After meeting with the suspected drug-trafficker, defendant left the location with a bag. Upon exiting the location, defendant engaged in counter-surveillance moves. Officers decided to conduct an "investigatory stop." They followed defendant into a fast food restaurant partially blocking his vehicle, and drew their weapons and approached the car. An officer pulled defendant from the vehicle and placed him in handcuffs. Although officers informed defendant that he was not under arrest, they detained him for a significant period of time. Ultimately, officers placed him in the back of a police vehicle and drove him to an apartment where they discovered cocaine.

The Sixth Circuit determined that the stop was supported by reasonable suspicion. In addition, with regard to the intrusion, the court held:

12

Having previously found that the officers possessed the requisite suspicion to warrant the stop, our inquiry turns to the second prong of the...test: Whether the means and measures utilized by the officers in the instant matter were "reasonable under the circumstances." Defendants assert that the officers conduct, *i.e.*, blocking Heath's vehicle, emerging with weapons drawn, pulling Heath from his vehicle, frisking and handcuffing him, "resulted in a de facto arrest."

Having considered all of the measures used by the officers, we find that the officers' conduct in effectuating the stop of Heath did not rise to the level of an arrest. While the amount of force used by these officers was highly intrusive and, under some circumstances, could be equated with an arrest, the mere use ... of force in making a stop will not necessarily convert a stop into an arrest.... When the surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop.  This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop.  We have uniformly found that the use of force must be necessary to protect officers from potentially dangerous situations.

...[T]he facts in the instant matter suggest that the officers reasonably believed that protective measures were necessary to effectuate the stop of Heath. We have already found that Heath was reasonably suspected of carrying drugs    the agents were, therefore, entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions and, thus, the degree of force utilized was reasonable.

Id. at 530.[2]  *See also*, *United States v. Atchley*, 474 F.3d 840 (6th Cir. 2007)(detention did not amount to arrest where an individual acting "nervous" and suspected of methamphetamine manufacture was placed in handcuffs); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309

---

[2]        In *Heath*, the court determined that the officers exceeded the bounds of an investigative stop by detaining defendant long after they discovered no evidence of any wrongdoing at the scene.  In contrast, however, the Court agrees with the government that probable cause to arrest defendant arose when the agents learned that defendant possessed a firearm belonging to another individual, for which defendant did not have a conceal-carry permit. Therefore, the Court need only analyze whether defendant was arrested during the 10-15 second interval between the time SA Moses arrived on the scene and the time officers learned of the weapon.

13

(6th Cir. 2005)(given the nature of the crime [of robbery], the hour of the day, and detainee's response that he was armed with a stun gun, officers were justified in drawing their weapons and using handcuffs to restrain detainee during investigative stop); *United States v. Foster*, 376 F.3d 577, 587-88 (6th Cir. 2004)(investigatory stop did not result in arrest where detainee suspected of PCP use was handcuffed for pat-down and placed in police cruiser so that detainee could not reach weapons possibly in vehicle, based on officer's knowledge that individuals taking PCP may become extremely violent).  *Compare*, *Lewis,* 779 F.3d 401 (detention resulted in arrest of female leaving house where police believed male made a threatening statement, where male was not in vehicle, and officers displayed weapons pointed at detainee's head, ordered her out of the car, grabbed her and threw her to the ground, kneeled on the small of her back, and handcuffed her); *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006)(investigatory stop resulted in arrest where police pulled over a station wagon suspected of speeding and possible robbery, ordered couple and teenager to exit the car, place their hands in the air, get on their knees with their hands behind their backs, while assault rifle and shotgun were aimed at the family, and officer on scene shot the family's dog).

Upon review, the Court finds that, based on the circumstances of this case, the degree of intrusion did not transform the investigative stop into an arrest.  SA Moses testified that he did not have time to put his vest on before proceeding to the rear of the building.  Once around the back of what SA Moses believed to be an abandoned building, he observed that defendant had exited the vehicle, left the driver's side door open, and was standing nearby. At the time of the encounter, he believed that the driver of the Jeep may be involved in a large-scale drug deal totaling approximately $1.5 million.   Agents also knew that Moldondao, who flew to Cleveland

14

for the purpose of executing the drug deal, was associated with the Pato Mexican drug trafficking organization. Like the officers in *Heath*, SA Moses testified that, in his extensive experience, individuals involved in drug trafficking are frequently armed. For purposes of officer safety, officers on the scene drew weapons, ordered defendant to the ground, and placed defendant's hand behind his back. Defendant indicated that he had a concealed pistol in his pocket that was not owned by him and for which he did not have a permit, and ultimately defendant was placed in handcuffs. Although the degree of intrusion in this case is more significant than in a typical investigative stop, the Court finds that the measures taken were reasonable. The crime at issue large scale drug trafficking is closely associated with violence and the agents reasonably believed that defendant may be armed and dangerous. This is not a situation where officers had a "bare inference" that defendant may be armed. The officers themselves set up the drug transaction, surveilled the situation throughout the day, and followed the Jeep directly from the Miles Road location.

Defendant relies on the fact that SA Moses's report indicates that he was instructed to take defendant into "custody." In other words, defendant appears to argue that SA Moses intended to arrest defendant. The test for determining whether a formal arrest occurred is, however, objective and the subjective intent of the officer has no bearing on whether a Fourth Amendment violation occurred. Even if SA Moses's intent was relevant, he testified that he intended to conduct an investigatory stop in order to identify the driver of the Jeep and determine what was "going on." SA Moses further testified that the phrase "in custody" and "investigatory stop" are not necessarily inconsistent. Thus, to the extent SA Moses's intent is somehow relevant, the Court credits his testimony that he intended to perform an investigatory detention.

15

Based on the foregoing, the Court concludes that the encounter between law enforcement and defendant at the point in time that law enforcement seized the weapon, did not amount to an arrest.[3]

    2.    Vehicle search

Having concluded that defendant's detention did not violate the Fourth Amendment, the Court finds that the evidence discovered during the search of the Jeep is not "fruit of the poisonous tree."  Rather, SA Moses testified that he detected an overwhelming odor of marijuana coming from the open driver's side door.  Thus, agents had probable cause to search the vehicle. *See, Foster*, 376 F.3d 577 (6th Cir. 2004)(during lawful *Terry* stop, officers' detection of the smell of marijuana coming from detainee's vehicle gave probable cause to search the vehicle without a search warrant).

     Even if the *Terry* stop rose to the level of illegal arrest, the Court finds that evidence discovered in defendant's vehicle need not be excluded as "fruit of the poisonous tree."

> The suppression or exclusionary rule is a judicially prescribed remedial measure and as with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.  Under this Court's holdings, the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' It extends as well to the indirect as the direct products of unconstitutional conduct.

*Segura v. United States*, 468 U.S. 796, 804 (1984)(citations and quotations omitted)(evidence obtained pursuant to a search warrant is not "fruit of the poisonous tree" where officers may have initially entered house illegally and remained there for 19 hours until government secured

---

[3]    In its summation, the government acknowledges that at some later unidentified point, the encounter resulted in an arrest.

16

search warrant, where search warrant was not based on any information discovered as a result of allegedly illegal entry) .  The exclusionary rule, however, is "applicable only ... where its deterrence benefits outweigh its substantial social costs.  Suppression of evidence ... has always been our last resort, not our first impulse." *Utah v Strieff*, 136 S.Ct. 2056,

Exclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining the evidence. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). Rather, the question is whether the evidence was "come at by exploitation of [the Fourth Amendment violation] or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v United States*, 371 U.S. 471, 487-88 (1963).

If the evidence obtained is sufficiently "attenuated" from the Fourth Amendment violation, the exclusionary rule does not apply.  Attenuation occurs in one of two ways.  It occurs "when the causal connection" is remote. *Hudson*, 547 U.S. 593.  Attenuation also occurs when "the interest protected by the constitutional guarantee would not be served by suppression of the evidence obtained." *Id*.

Upon review, the Court finds that under either test, evidence discovered during the search of the Jeep is sufficiently attenuated to the detention of defendant such that exclusion is not warranted.  First, the causal connection is remote.  At the time agents approached defendant, he was outside of his vehicle.  Agents did not pull the vehicle over or otherwise seize the Jeep.  The detection of the smell of marijuana was not related to the actions take by agents in detaining defendant.  This is not a situation in which agents engaged in an unlawful traffic stop and "but for" the traffic stop, they would not have been able to detect the smell of marijuana.  Rather, the vehicle was simply located next to the area in which agents detained defendant.  As such, the

17

Court finds any causal connection between the detection of marijuana and the detention of defendant is remote.

Even if there is more than a "remote" causal connection, the interest "protected by the constitutional guarantee would not be served by suppression of the evidence obtained."   Here, the constitutional guarantee to be free from an illegal arrest is not served by suppression of evidence obtained after officers on the scene detect the smell of marijuana from a nearby empty vehicle.  Had the officers conducted a search incident to an arrest, or detected the odor after wrongfully pulling the vehicle over, the result may likely be different as the evidence may have been obtained "by exploitation of [the initial] illegality."  *See e.g., United States v. Pearce*, 531 F.3d 374, n.2 (6th Cir. 2008)(hypothesizing that the plain view observations of an officer arriving at the scene after an illegal traffic stop would be sufficiently attenuated such that suppression would not be warranted); *United States v. Elmore*, 692 F.Supp.2d 915 (E.D. Tenn. 2010)(evidence of gun found on ground outside of vehicle need not be suppressed after illegal traffic stop because the observation of the gun was not "exploitive of her unlawful conduct, or sufficiently deliberate so as to warrant exclusion.").  Because the search of the vehicle was based on the detection of marijuana and was not exploitive of the detention, suppression of the evidence located in the vehicle is not warranted, even if the detention amounted to an arrest. The constitutional guarantee to be free from an illegal arrest would not be served by suppression of the evidence obtained from the probable cause search of the vehicle.

**CONCLUSION**

For the foregoing reasons, defendant Rico Polk's Motion to Suppress is DENIED.

IT IS SO ORDERED.

18

_/s/_ Patricia A. Gaughan

PATRICIA A. GAUGHAN
United States District Judge

Dated:  4/29/21